UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DIETRA R.[1],                        )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      No. 1:25-cv-00749-TWP-MKK
                                     )
FRANK J. BISIGNANO,                  )
                                     )
            Defendant.               )

**REPORT AND RECOMMENDATION**

Plaintiff Dietra R. requests judicial review of the final decision of the

Commissioner of the Social Security Administration (the "SSA"), denying her child's

("S.L.M.'s")[2] application for Supplemental Security Income ("SSI") payments under

Title XVI of the Social Security Act (the "Act"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

On October 17, 2025, United States District Judge Tanya Walton Pratt entered an

Order referring this matter to the undersigned for a report and recommendation

regarding the appropriate disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

(Dkt. 16). For the reasons set forth below, the undersigned recommends that the

Commissioner's decision denying the application for benefits be **REVERSED** and

that the Court **REMAND** this matter to the Commissioner for further proceedings.

---

[1] In an effort to protect the privacy interests of claimants for Social Security benefits, the Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee of the Administrative Office of the United States Courts regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The undersigned has elected to implement that practice in this Report.

[2] In accordance with Federal Rule of Civil Procedure 5.2(a)(3), the Court uses the initials of claimant because claimant is a minor.

## I.    PROCEDURAL HISTORY

Plaintiff filed S.L.M.'s application for SSI benefits on January 17, 2023, alleging disability beginning October 1, 2020. (Dkt. 9-5 at 2–12, R. 225–35). Her claim was initially denied on June 14, 2023, (Dkt. 9-4 at 13, R. 124), then again upon reconsideration on August 31, 2023, (*id.* at 27, R. 138). Plaintiff requested a hearing, which occurred telephonically before Administrative Law Judge ("ALJ") Terry L. Miller on March 19, 2024. (Dkt. 9-2 at 68, R. 67). At the hearing, Plaintiff, who was represented by counsel, testified. (*Id.* at 69, R. 68). S.L.M did not appear at the hearing. (*Id.* at 68, 70, 74, R. 67, 69, 73). On April 22, 2024, the ALJ concluded S.L.M. had not been under a disability, as defined in the Act, 42 U.S.C. § 1382c(a)(3)(C), since January 17, 2023. (Dkt. 9-2 at 62, R. 61). The SSA Appeals Council denied Plaintiff's request for review, finding Plaintiff failed to provide a basis for changing the ALJ's decision. (*Id.* at 2, R. 1). Plaintiff then filed a request for judicial review. *See* 42 U.S.C. § 405(g).

## II.    LEGAL STANDARD

To qualify for benefits, a claimant must be disabled within the meaning of the Act. "Social security disability benefits are designed for disabled workers, but low-income parents or guardians may obtain them on behalf of disabled children as well." *Keys v. Barnhart*, 347 F.3d 990, 991 (7th Cir. 2003); 42 U.S.C. § 1382. For a child to be considered disabled, the parent or guardian must show that the child "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

"[S]ince disabled children generally do not have a work history, the structure of the disability program for them is necessarily different from that for adults, except in cases in which the child has a 'listed impairment,' that is, an impairment that would entitle the adult to disability benefits without any further inquiry into his ability to perform his past work or some other work; the child is treated the same in such a case." *Keys*, 347 F.3d at 991–92 (citing 20 C.F.R. § 416.924(d)) (citation omitted). If the child does not have a listed impairment, then "the question is whether the child is severely limited in functioning in specified areas of life activity." *Sanchez v. Barnhart*, 467 F.3d 1081, 1082 (7th Cir. 2006).

> [T]he Social Security Administration has "designate[d] six 'domains' of functioning: acquiring and using information; attending to and completing tasks; interacting with and relating to other people; moving about and manipulating objects; caring for oneself; and health and physical wellbeing. 20 C.F.R. § 416.926a(b)(1). A claimant is to be found disabled if he has an 'extreme' limitation in at least one of the domains, or 'marked' limitations in at least two. 20 C.F.R. § 416.926a(d)."

*Sanchez*, 467 F.3d at 1082 (quoting *Keys*, 347 F.3d at 994). A "marked" limitation exists when the "impairment(s) interferes seriously with [the] ability to independently initiate, sustain, or complete activities," 20 C.F.R. § 416.926a(e)(2)(i), whereas an "extreme" limitation exists when the "impairment(s) interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). When considering the extent of a claimant's limitation

in any domain, the ALJ "examine[s] all the information . . . in [the] case record about how [the claimant's] functioning is limited because of [the] impairment(s), and . . . compare[s] [the claimant's] functioning to the typical functioning of children [of the same] age who do not have impairments." 20 C.F.R. § 416.926a(f)(1).

The regulations set forth a three-step process for evaluating child disability claims. *Hopgood v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009); 20 C.F.R. § 416.924(a). The ALJ considers whether: (1) the child is engaged in substantial gainful activity; (2) the child has a severe impairment or combination of impairments; and (3) the child has an impairment or combination of impairments that meets, medically equals, or functionally equals a listing. *See L.D.R. v. Berryhill*, 920 F.3d 1146, 1150 (7th Cir. 2019); *Hopgood*, 578 F.3d at 699; 20 C.F.R. § 416.924. A negative answer at any point terminates the inquiry and leads to a determination that the claimant is not disabled. If the child satisfies Steps Two and Three and the impairment(s) meet the duration requirement, then the child is disabled. *Hopgood*, 578 F.3d at 699; 20 C.F.R. § 416.924(a). In making these determinations, the ALJ must consider all relevant evidence and "the combined effect of all medically determinable impairments, even those not severe." *L.D.R.*, 920 F.3d at 1150; 20 C.F.R. § 416.924(a). The claimant bears the burden of proof at every step. 20 C.F.R. § 416.912(a); *see also, e.g., Chrisman ex rel. N.R.C. v. O'Malley*, No. 1:23-cv-00046-SLC, 2024 WL 1341073, at *3 (N.D. Ind. Mar. 28, 2024); *Patricia C. v. Kijakazi*, No. 1:20-cv-03056-DLP-JRS, 2022 WL 2951428, at *2 (S.D. Ind. July 26, 2022); *R.J. ex*

*rel. Taylor v. Colvin*, No. 1:11-cv-01001-SEB-DKL, 2014 WL 1328166, at *2 (S.D. Ind. Mar. 28, 2014).

Judicial review of the Commissioner's denial of benefits is to determine whether it was supported by substantial evidence and free of legal error. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is based on substantial evidence. Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (internal quotation marks and citations omitted); *see also Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands "more than a scintilla" of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether S.L.M. is disabled, "but rather, whether the ALJ's findings were supported by substantial evidence" and free of legal error. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge between the evidence and the conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner."

*Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000), *as amended* (Dec. 13, 2000); *see also Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)) ("Where substantial evidence supports the ALJ's disability determination, we must affirm the decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'"). "Nevertheless, [the Court must] conduct a 'critical review of the evidence' before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citation omitted); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to his conclusions," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

### III.    BACKGROUND

#### A.    Factual Background

S.L.M. was nine years old when her mother applied for SSI benefits on her behalf. (Dkt. 9-2 at 54, R. 53). At the time of her disability hearing, S.L.M. was ten years old and in the third grade. (*Id.* at 58, R. 56).

#### B.    ALJ Decision

In determining whether S.L.M. qualified for benefits under the Act, the ALJ employed the three-step evaluation process set forth in 20 C.F.R. § 416.924. (Dkt. 9-2 at 53–54, R. 52–53). At Step One, the ALJ found that S.L.M. had not engaged in substantial gainful activity since January 17, 2023, the application date. (*Id.* at 54, R. 53). At Step Two, the ALJ found S.L.M. had three severe impairments: post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), and anxiety. (*Id.*). He also found that S.L.M. had the non-severe impairment of mild scoliosis. (*Id.*). At Step Three, the ALJ found that S.L.M. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, paying particular attention to Medical Listings 112.06 (anxiety and obsessive compulsive disorders), 112.11 (neurodevelopmental disorders), and 112.15 (trauma- and stressor-related disorders). (Dkt. 9-2 at 55–57; R. 54–56). As to the "paragraph B" criteria, the ALJ found S.L.M. had mild to moderate functional limitations in her abilities to understand, remember and apply information and to adapt or manage herself, and moderate functional limitations in her abilities to

interact with others and to concentrate, persist, or maintain pace. (*Id.* at 56, R. 55).

The ALJ also found that S.L.M. did not have an impairment or combination of impairments that functionally equaled the severity of medical listings 112.06, 112.11, or 112.15. (*Id.* at 57–62, R. 56–61). Specifically, the ALJ found the following degrees of limitation in the six domains of functioning:

- Acquiring or using information: Less than a marked limitation.
- Attending and completing tasks: Less than a marked limitation.
- Interacting and relating with others: Less than a marked limitation.
- Moving about and manipulating objects: no limitation.
- Ability to care for herself: Less than a marked limitation.
- Health and physical well-being: no limitation.

(*Id.* at 57, R. 56). As such, the ALJ concluded Plaintiff was not disabled. (*Id.* at 62, R. 61).

## IV.    DISCUSSION

Plaintiff argues that the ALJ's decision is not supported by substantial evidence and is tainted by legal errors. (Dkt. 12 at 1, 7–8). Plaintiff further argues that the ALJ erred in concluding that S.L.M.'s impairments did not meet the criteria for Listings 112.15 and 112.11 and that they were not functionally equivalent to said listings. (*Id.*). In response, the Commissioner insists that the ALJ's decision was supported by substantial evidence and free of legal error. (Dkt. 14 at 5, 8, 12). Plaintiff replies that the Commissioner did not address the legal errors in the ALJ's decision. (Dkt. 15 at 1).

8

### A.    Medical Listings 112.15 and 112.11

The undersigned begins with Plaintiff's argument that the ALJ's Step Three analysis was flawed. (Dkt. 12 at 7–8). She argues that because the ALJ did not explain how certain evidence of "normal" findings and functioning outweighed evidence favorable to S.L.M., he failed to build a logical bridge between the evidence and his decision. (*Id.* at 7–8). The Commissioner argues that the ALJ considered the evidence in the record and stresses that the ALJ was not required to "cite to every piece of favorable evidence." (Dkt. 14 at 5).

To allow for meaningful judicial review, an ALJ's opinion must discuss the claimant's impairments in conjunction with the listings, the combined effect of the impairments on the child's functioning, and evidence that runs contrary to his or her decision. *Brindisi v. Barnhart*, 315 F.3d 783, 786–87 (7th Cir. 2003). The ALJ's opinion falls short in this regard for several reasons.

First, the ALJ's opinion lacks sufficient detail for the undersigned to determine why the ALJ concluded that S.L.M.'s impairment(s) did not satisfy the criteria for the Listings. To satisfy Listing 112.15, a claimant must establish, under subparagraph (A), medical documentation of certain characteristics of either PTSD or reactive attachment disorder. 20 C.F.R. pt. 404, subpt. P, App. 1, § 112.15 (2026). In addition, the claimant must establish either (B) extreme limitation of one, or marked limitation of two, areas of functioning, or (C) that her mental disorder is "serious and persistent" as described by the regulations. *Id.* A careful and holistic review of the ALJ's decision fails to reveal which prong the ALJ found to be lacking

in S.L.M.'s case. Instead of fully articulating his decision-making process, the ALJ merely recited the Listing criteria and some of S.L.M.'s impairments and symptoms. (*See* Dkt. 9-2 at 55–60, R. 54–59). He did not expand on that discussion; nor did he explain which of S.L.M.'s symptoms or diagnoses could possibly fulfill the criteria and why he decided that they did not do so. (*See id.*).

Take, for example, the subparagraph (A)(1) requirement that PTSD claimants must have medical documentation of "exposure to actual or threatened death, serious injury, or violence." (Listing 112.15(A)(1)(a)). One could surmise that the ALJ found insufficient evidence of this prong: he discusses S.L.M.'s exposure to violence[3] but qualifies it by stating "the record does not appear to otherwise document [the domestic violence] by way of social service agency or legal involvement." (Dkt. 9-2 at 59, R. 58). Although the ALJ does not state how he weighs the lack of social service or law enforcement documentation, the inference is that the absence of documentation rendered the record insufficient. Is this why the ALJ concluded that S.L.M. did not satisfy subparagraph (A)(1) of Listing 112.15, a finding which would be fatal to her ability to meet this Listing? It is unclear, and such obscurity undermines effective judicial review. *See Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007) (holding ALJ's inference that because Plaintiff was not diagnosed with ADHD, he did not have marked attention problems lacked

---

[3] Evidence appears throughout the record that S.L.M. was exposed to violence. For example, her mental health provider documented that she "witnessed [her] ex-grandfather physically abuse [her] mom via [domestic violence]." (Dkt. 9-7 at 62, R. 400). Her mother testified at the hearing that S.L.M. "witnessed [her ex-grandfather] grab ahold of [S.L.M.'s mother] and snap [her] neck around real quick and shake [her] neck like a dog shakes a toy with a squeaker in it." (Dkt. 9-2 at 92, R. 91).

10

evidentiary support when ALJ produced no evidence that attention problems exist only in children with ADHD). "[W]here the ALJ's decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded.'" *Giles*, 483 F.3d at 486 (quoting *Steele*, 290 F.3d at 940) (citing *Haynes v. Barnhart*, 416, F.3d 621, 626 (7th Cir. 2005)).

The ALJ's discussion of subparagraphs (1)(A)(b), (c), and (d) of Listing 112.15 is similarly unclear. The record contains evidence that S.L.M. experienced "[s]ubsequent involuntary re-experiencing of the traumatic event" and "[a]voidance of external reminders of the event," (Listing 112.15(A)(1)(b), (c)), yet the ALJ failed to mention, much less meaningfully address, that evidence in his decision. For instance, the mental health provider's 2021 progress notes documented that S.L.M. was experiencing symptoms of "dissociation, flashbacks, as well as avoidance." (Dkt. 9-7 at 47, R. 385). But the ALJ did not include this evidence in his decision at all. Instead, the ALJ reduced S.L.M.'s re-experiencing of the traumatic events to statements that she did "not want to be around men," that she "replayed the events during her own playtime," and that "these incidents have lessened over time." (Dkt. 9-2 at 59, R. 58). Further, the ALJ's discussion of S.L.M.'s behavioral and mood disturbances, (Listing 112.15(A)(1)(d)), mentioned only meltdowns and her mother's disagreement with the psychiatrist's recommendation to stop the medication for S.L.M.'s mood swings. (Dkt. 9-2 at 59–60, R. 58–59). Moreover, the ALJ failed to mention other record evidence of S.L.M.'s behavioral and mood disturbances. (*See, e.g., id.* at 81, R. 80 (S.L.M. had "taken . . . the metal piece of a purse strap and left

11

welts and bruises on [her mother] because she . . . got so elevated and aggravated and mad because [the mother] t[ook] her tablet away"), 82, R. 81 (S.L.M. "flipped [her grandmother] out of a computer chair because [her mother and grandmother] took her tablet and computer away from her because she wasn't listening"); Dkt. 9-7 at 44, R. 382 (S.L.M. had "smacked her younger sister"), 268, R. 606 (S.L.M. "t[ore] her clothes for . . . 2 weeks"), 256, R. 594 (S.L.M. was "defiant and [did] not listen [or] do what she [was] asked. She threw things at her mother . . . . screamed, cried, argued, whined, and threw things when she refused to do the dishes. [And] [s]he destroyed the shower curtain . . . when she [was] mad."), 464, R. 802 (neighbor called the Department of Child Services ("DCS") during one of S.L.M.'s meltdowns), 467, R. 805 (S.L.M. had exhibited "recent physical violent behavior toward [her] mother at home" and when her mother called the police because she could not control S.L.M., S.L.M. "laughed at the [police] officers" when they tried to redirect her); Dkt. 9-8 at 7, R. 929 (S.L.M. had been "abusing the animals")). These reports were documented by mental health providers, mental health para-providers, and S.L.M.'s mother from at least 2021 through 2023. Though the ALJ mentioned that S.L.M.'s temper would "escalate" to the point that she would scream at her sister, had hit her mother, and had pushed her grandmother, he stated that when her behavior gets this bad, they "leave her alone to avoid her hurting them" and that "this method of handling her meltdowns is apparently working, as there have been no repeated bad episodes since then." (Dkt. 9-2 at 59, R. 58). The ALJ did not discuss the more recent meltdowns that prompted the neighbor to call DCS, her

12

mother to call the police, or the reports of S.L.M. abusing animals, all episodes that postdated the incidents he did mention. Though the Commissioner argues that "the ALJ explicitly indicated that the evidence relied on was discussed later in the decision," (Dkt. 14 at 8), the ALJ did not discuss much of the evidence favorable to a possible finding of disability in any portion of his opinion. The Commissioner is correct that the ALJ does not need to mention every piece of evidence in his decision; however, the ALJ cannot ignore entire lines of evidence that undermine his conclusion.[4] *See Arnett*, 676 F.3d at 592.

The ALJ made similar conclusory statements regarding Listing 112.11, failing to expand on which criteria he found to be lacking and failing to address significant evidence that appears to contradict his decision. (*See* Dkt. 9-2 at 56–57, R. 55–56). The Commissioner offers no legal argument for why the ALJ's cursory conclusions suffice. (*See* Dkt. 14 at 8 (only stating: "The ALJ discussed the requirements to meet each listing[] and explained that the evidence did not support that Plaintiff met those requirements."). As such, the undersigned finds that the

---

[4] The ALJ also did not cite any of the evidence that S.L.M. exhibited increased arousal and reactivity (subparagraph (A)(1)(e) of Listing 112.15). For instance, in June 2022, the mental health provider documented that S.L.M. "shared about having the nightmare." (Dkt. 9-7 at 288, R. 626). Nor did the ALJ discuss evidence that S.L.M. did not seek comfort when distressed and did not respond to comfort when distressed (subparagraphs (A)(2)(a) and (b)). For example, the life skills provider noted in April 2023, that S.L.M. "[would go] under the bed when [she was] sad or scared", (Dkt. 9-7 at 371, R. 709). And in January 2023, the mental health provider noted that S.L.M. would have "meltdown[s] [with] screaming and yelling for 2 hours" at a time, (*id.* at 460, R. 798).

ALJ's conclusions at Step Three were not supported by substantial evidence and that remand is necessary.

The Commissioner's reliance on the ALJ's "consider[ation] that no treating or examining medical source concluded that any of [S.L.M.'s] conditions met a medical listing" is also unavailing. (Dkt. 14 at 9). The Commissioner correctly notes that "the state agency ["SA"] psychology consultants, Drs. Horton and Gange, found that Plaintiff's impairments did not meet a listing." (*Id.* (citing Dkt. 9-3 at 5, 11, R. 102, 108)). But this fact does not remedy the flaws in the ALJ's opinion. First, the Commissioner's argument amounts to an impermissible post hoc rationalization; the ALJ did not cite to either of the SA consultants' opinions in declaring that S.L.M.'s impairments did not meet a listing. (*See* Dkt. 9-2 at 55–57, R. 54–56); *see also Secs. & Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943). Second, both SA consultants considered only Medical Listing 112.11. (*See* Dkt. 9-3 at 5, 11, R. 102, 108). The ALJ did not cite any medical expert opinion that considered whether S.L.M.'s impairments met the criteria for Medical Listings 112.15 or 112.06 (though Plaintiff is not contesting the assessment of Listing 112.06). (*See* Dkt. 9-2 at 56–57, R. 55–56). Nor did the ALJ discuss why he considered those opinions, as they relate to Listing 112.11, to be persuasive in light of the other record evidence.[5] (*See id.*). Further, contrary to the Commissioner's argument, a medical expert does not need to opine whether a claimant meets the criteria for a medical listing; the ALJ "determines if a claimant's disability meets or is medically

---

[5] In contrast, the ALJ did assess the relative persuasiveness of the agency consultants' opinions in his discussion of the six domains of functioning. (*See* Dkt. 9-2 at 60–62, R. 59–61).

equivalent to a disability in the Listing" when the record contains sufficiently extensive medical records to permit the ALJ to make such a determination. *Due v. Massanari*, 14 Fed. App'x 659, 665 (7th Cir. 2001) (citing *Henderson v. Apfel*, 179 F.3d 507, 513 (7th Cir. 1999) (an ALJ has a duty to develop a full and fair record, consulting a medical consultant when the record is incomplete or where parts of the medical history must be inferred; but when the medical record is complete the ALJ is not required to consult an expert)).

### B.    Functional Equivalence

Although the above reasons provide a sufficient basis for remand, the ALJ's functional equivalency analysis provides separate, independent grounds for remand. Under SSR 09-1p, the ALJ is to "evaluate the 'whole child' when [making] a finding regarding functional equivalence. . . . considering how the child functions every day and in all settings compared to other children the same age who do not have impairments." 2009 WL 396031, at *2, (S.S.A. Feb. 17, 2009). Plaintiff argues that the ALJ failed to do so. (*See, e.g.*, Dkt. 12 at 19 (comparing S.L.M.'s ability to acquire and learn information to benchmarks for "school-age children"), 21 (comparing S.L.M.'s ability to interact and relate with others to that of other children in her age group), 22 (comparing S.L.M.'s ability to care for herself with that of other children); *see also* Dkt. 15 at 12–13 ("The ALJ summarized the evidence but did not compare [S.L.M.'s] functioning to that of same-age peers, as required by the 'whole-child' framework.")). The Commissioner argues that the ALJ considered S.L.M.'s mother's testimony and other record evidence and assessed

15

S.L.M.'s limitations considering the evidence, ultimately finding more restrictive limitations than the SA consultants did. (Dkt. 14 at 12). However, the Commissioner does not address the argument that the ALJ failed to compare S.L.M.'s functioning to other children her age as mandated by the regulations.

The ALJ's assessment of S.L.M.'s functional limitations falls short of what the regulations require. In the domain of acquiring and using information, for instance, the ALJ noted that one of the SA consultants found a less than marked limitation because S.L.M. had a 504 plan in place and the ALJ did not disagree with this assessment because "it [wa]s reasonable that further improvement would be anticipated with implementation of the plan." (Dkt. 9-2 at 60, R. 59 (referencing Exh. 2A at 3 (opinion of SA Dr. Horton), (Dkt. 9-3 at 5, R. 102))). However, the ALJ did not analyze S.L.M.'s functional limitations in this domain by comparing her to children within her age group. The regulations explain that an unimpaired child S.L.M.'s age "should be able to learn to read, write, and do math." 20 C.F.R. § 416.926a(g)(2)(iv). Such an unimpaired child should be able to read "about various subjects and produc[e] oral and written projects, solv[e] mathematical problems, tak[e] achievement tests" and "use increasingly complex language" in sharing ideas. *Id.* Additionally, children her age "should be able to understand[] and respond[] to the opinions of others." *Id.* The ALJ did not discuss record evidence that S.L.M.'s functioning was significantly limited in these areas when compared to her peers. For example, she was eligible for special education services and an individualized educational plan ("IEP"), (Dkt. 9-2 at 21, R. 20). She had not passed the IREAD-3

16

assessment, (*id.* at 29, R. 28), and she scored in the 1st percentile for reading on standardized testing, (*id.* at 30, R. 29). Further, she demonstrated "difficulty reading grade-level sight words and answering comprehension questions about what she read," (*id.*), and was "falling below grade-level expectations in reading," (*id.*). In other standardized testing, she fell in the 0.3rd percentile for spelling, the 1st percentile for pseudoword decoding, and the 9th percentile for mathematics. (*Id.* at 19, R. 18). She needed extra time to complete assignments and required her grandmother to sit by her side as her learning coach throughout the day during school. (*Id.* at 18, 33, R. 17, 32).

Again, although the ALJ need not address every piece of evidence in his decision, he does have to meaningfully tackle evidence that runs contrary to his decision. In evaluating a child's functioning as compared to other children of the same age, the ALJ must consider evidence and resolve conflicting opinions in the relevant age range in each domain. *L.D.R.*, 920 F.3d at 1152; *see also* 20 C.F.R. §§ 416.926a(e)(1). The ALJ failed to do so when assessing S.L.M.'s ability to acquire and use information. Merely stating that it is "reasonable that further improvement would be anticipated with implementation of the 504 plan," (Dkt. 9-2 at 60, R. 59), does not adequately confront the contrary evidence that could support a higher degree of limitation in this domain. The Court "require[s] an explanation of why strong evidence favorable to the plaintiff is overcome by the evidence on which the ALJ relies." *Giles*, 483 F.3d at 488 (citation omitted). The ALJ did not provide such

17

an explanation here, leaving his decision without the necessary accurate and logical bridge between the evidence and his conclusion. *See id.* at 487.

The undersigned arrives at a similar conclusion with regard to the ALJ's assessment that S.L.M. had a less than marked limitation in attending and completing tasks. Plaintiff argues this conclusion fails to align with, or account for, the evidence that S.L.M. suffered from significant difficulties in inattentiveness, easy distraction, frequent need for redirection, and a persistent need for her grandmother to attend class and sit next to her during class to help maintain her focus. (Dkt. 12 at 20). Other than the argument stated above, the Commissioner does not counter this argument. (*See* Dkt. 14 at 12). In evaluating this domain, the ALJ rejected the SA consultants' findings of no limitation, noting that it did not "comport with their finding for severe ADHD." (Dkt. 9-2 at 60, R. 59). In finding a less than marked limitation, the ALJ acknowledged the severe impairment but remarked that S.L.M.'s prescribed medication seemed to be "helpful and to fairly-well control" her symptoms. (*Id.* at 60–61, R. 59–60). However, the ALJ did not reconcile these findings with evidence that, despite the medication and therapy, "[r]edirection was often needed." (*Id.* at 33, R. 32; *see also id.* (S.L.M. needed "her grandmother sitting next to her during class to help focus her"); Dkt. 9-7 at 62, R. 400 (in addition to the classroom evidence, S.L.M.'s mental health providers noted that S.L.M. required at least four to five reminders to complete her tasks at home), 66, R. 404 (S.L.M. required coaching from her mother to stay on task), 93, R. 431 (S.L.M. often "forg[ot] halfway through chores [w]hat [was] asked of her), 166,

R. 504 (during therapy sessions, S.L.M. was noted to be "easily distracted, [and was] hard to stay on task[] and stay in one spot during [the] session [such] that she was redirected by adults several times"); Dkt. 9-8 at 7, R. 929 (in August 2023, S.L.M. was still not following directions and was refusing to take showers)). The ALJ also neglected to square this evidence with the regulations' discussion that an unimpaired child of S.L.M.'s age "should be able to focus [her] attention in a variety of situations in order to follow directions," 20 C.F.R. § 416.926a(h)(2)(iv), complete classroom and work assignments, stay on task, and sustain attention well enough to read by herself and complete family chores, and "complete a transition task without extra reminders and accommodation." *Id.* When an ALJ makes conclusory statements that are contrary to the evidence presented and fails to address the portions of the medical, school, and home record that are favorable to the claimant, his decision is not supported by substantial evidence. *Hopgood*, 578 F.3d at 697. As noted above, inadequate articulation of the ALJ's decision making prevents meaningful review. The ALJ's errors in analyzing functional equivalence and in articulating his decision are not harmless, and remand is required. *See Buckhanon ex rel. J.H. v. Astrue*, 368 Fed App'x 674, 680 (7th Cir. 2010) (claimant must show ALJ mischaracterized at least two marked limitations to warrant remand).

Plaintiff further argues that the ALJ made similar errors in not building a sufficient bridge between the record evidence and his determination that S.L.M. has a less than marked limitation in interacting and relating with others and in

19

caring for herself. (Dkt. 12 at 21–23). Because the undersigned has found sufficient reasons to recommend remand, the undersigned does not find it necessary to analyze these remaining arguments.

## V.    CONCLUSION

For the reasons detailed herein, the undersigned recommends that the ALJ's decision denying S.L.M. benefits be **REVERSED** and **REMANDED** for further proceedings.

Any objections to the Magistrate Judge's Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Failure to file objections within fourteen (14) days after service will constitute a waiver of subsequent review absent a showing of good cause for such failure.

So **RECOMMENDED.**

Date: 06/11/2026

M. Kendra Klump
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via CM/ECF